**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile:  (949) 706-6469

Attorneys for Plaintiffs

### UNITED STATE DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>          v.<br><br>LUXY HAIR CO., a Nova Scotia company and DOES 1 through 10, inclusive,<br><br>                  Defendants. | Case No. 3:23-cv-00657-LAB-BLM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT**<br><br>Date:          June 12, 2023<br>Time:          11:15 a.m.<br>Courtroom:  14A<br>Judge:        Hon. Larry A. Burns |

# **TABLE OF CONTENTS**

**Page(s)**

I.     INTRODUCTION ...................................................................................1

II.    ARGUMENT..........................................................................................1

    A.    The Complaint Sufficiently Pleads a VPPA Claim.......................1

          1.    Defendant Is a "Video Tape Service Provider" Under the VPPA.......2

          2.    Plaintiff Is a "Consumer" as Defined by the VPPA. ..........................5

    B.    If a Curable Defect Remains, Leave to Amend Should Be Granted...........11

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Federal Cases**

4

*Ambrose v. Boston Globe Media Partners LLC*,
5      2022 WL 4329373 (D. Mass. Sept. 19, 2022) ....................................1, 3

6

*Austin-Spearman v. AMC Network Enter. LLC*,
7      98 F. Supp. 3d 662 (S.D.N.Y. 2015) ................................................10

8

*Barker v. Riverside County Office of Education*,
9      584 F.3d 821 (9th Cir. 2009) ........................................................8, 9

10

*Belozerov v. Gannett Co., Inc.*,
       - F. Supp. 3d -, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022) ....... *passim*
11

*Cappello v. Walmart Inc.*,
12      2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) (Seeborg, J.) ................................3

13

*Carter v. Scripps Networks, LLC*,
14      2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ....................................11

15

*Connecticut Nat'l Bank v. Germain*,
16      503 U.S. 249 (1992).....................................................................11

17

*Czarnionka v. The Epoch Times Ass'n, Inc.*,
18      2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022).............................1, 3

19

*Ellis v. Cartoon Network, Inc.*,
20      803 F.3d 1251 (11th Cir. 2015) .........................................6, 7, 8

21

*Feldman v. Star Tribune Media Company LLC*,
       2023 WL 2388381 (D. Minn. Mar. 7, 2023) ......................................1
22

*Hernandez v. Williams, Zinman & Parham PC*,
23      829 F.3d 1068 (9th Cir. 2016) ....................................................10, 11

24

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
25      402 F. Supp. 3d 767 (N.D. Cal. 2019) (Chhabria, J.)...........................3

26

*In re Hulu Privacy Litig.*,
27      2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (Beeler, Mag. J.) .......2, 3, 6

28

*In re Hulu Privacy Litig.*,
   2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ......................................................1

*In re Vizio, Inc. Consumer Privacy Litig.*,
   238 F. Supp. 3d 1204 (C.D. Cal. 2017) ........................................................2, 4, 5

*Lebakken v. WebMD, LLC*,
   2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ........................................... *passim*

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ............................................................................12

*Louth v. NFL Enterprises LLC*,
   2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022)...........................................2, 3

*Matera v. Google Inc.*,
   2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ...................................................10

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998) ...............................................................................................1

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974) ..............................................................................................9

*Stark v. Patreon, Inc.*,
   - F. Supp. 3d -, 2022 WL 7652166, at *7-*8 (N.D. Cal. Oct. 13, 2022)..........1, 5

*Yershov v. Gannett Satellite Info. Network, Inc.*,
   104 F. Supp. 3d 135 (D. Mass. 2015), *rev'd*, 820 F.3d 482 (1st Cir.
   2016) .....................................................................................................................7

*Yershov v. Gannett Satellite Info Network, Inc.*,
   820 F.3d 482 (1st Cir. 2016) ............................................................... *passim*

**California Cases**

*Flanagan v. Flanagan*,
   27 Cal. 4th 766 (2002) .......................................................................................10

*Leader v. Cords*,
   182 Cal. App. 4th 1588 (2010) ..........................................................................10

*Ribas v. Clark*,
   38 Cal. 3d 355 (1985) .........................................................................................10

*Smith v. LoanMe, Inc.*,
    11 Cal. 5th 183 (2021) ............................................................................1

**Federal Statutes**

18 U.S.C.
    § 2710 *et seq.* ......................................................................................1
    § 2710(a)(1)................................................................................5, 6, 11
    § 2710(a)(4)................................................................................2, 4, 5
    § 2710(b) ..............................................................................................1
    Video Privacy Protection Act ....................................................... *passim*

**Federal Rules**

Fed. R. Civ. P. Rule 15(a)(2) ..........................................................................12

**Other Authorities**

American Heritage Dictionary 1726 (4th ed. 2000) ...........................................7

S. Rep. 100-599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1; 1988
    WL 243503 ..........................................................................................2

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.        INTRODUCTION

Although Defendant contends that Plaintiff's interpretation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 *et seq.*, was never intended by Congress, (Def.'s Mem. at 3-6), Defendant ignores that statutory prohibitions "often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed," *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 198-99 (2021) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).  Multiple federal courts have held that similar claims were plausibly alleged.[1]  Here, the allegations in the Complaint are particularized, detailed, and robust.  As such, the Motion to Dismiss should be denied in its entirety.

## II.        ARGUMENT

### A.        The Complaint Sufficiently Pleads a VPPA Claim.

_____

[1] Multiple federal courts have recognized as plausible the allegation that the Facebook ID itself constitutes personal identifiable information ("PII").  *Feldman v. Star Tribune Media Company LLC*, 2023 WL 2388381, at *8-*10 (D. Minn. Mar. 7, 2023); *Belozerov v. Gannett Co., Inc.*, - F. Supp. 3d -, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022) ("A Facebook ID meets the broad definition of PII in this circuit") ("A Facebook ID is a unique identifier that allows anyone to discover the user's identity."); *Czarnionka v. The Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022); *Lebakken v. WebMD, LLC*, 2022 WL 16716151, at *4 (N.D. Ga. Nov. 4, 2022); *Stark v. Patreon, Inc.*, - F. Supp. 3d -, 2022 WL 7652166, at *7-*8 (N.D. Cal. Oct. 13, 2022); *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022); *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID is more than a unique, anonymous identifier.  ***It personally identifies a Facebook user***.  That it is a string of numbers and letters does not alter the conclusion. Code is a language, and languages contain names, and the string is the Facebook user name.") (emphasis added) (finding a material issue of fact that the information transmitted to Facebook was sufficient to identify individual consumers).

The above-mentioned decisions that recognize that a Facebook ID constitutes PII similarly recognize as plausible the allegation that a defendant website operator programmed the Facebook Pixel into its website code satisfies the "knowingly discloses" element of VPPA in 18 U.S.C. § 2710(b).  *Feldman*, 2023 WL 2388381, at *10; *Belozerov*, 2022 WL 17832185, at *4; *Czarnionka*, 2022 WL 17069810, at *4; *Lebakken*, 2022 WL 16716151, at *4-*5; *Stark*, 2022 WL 7652166, at *7-*8; *Ambrose*, 2022 WL 4329373, at *2.  "By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within." *Czarnionka*, 2022 WL 17069810, at *3.  "[A]rguing that transmitting cookies is just the normal way that webpages … load is not enough to negate knowledge or show the absence of evidence about knowledge." *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *16.

1   **1.    Defendant Is a "Video Tape Service Provider" Under the VPPA.**

2       The Complaint plausibly alleges that Defendant is a "video tape service provider"

3   under the VPPA.  First, the VPPA defines "video tape service provider" to mean "any

4   person, engaged in the business, in or affecting interstate or foreign commerce, of rental,

5   sale, *or delivery of* prerecorded video cassette tapes *or similar audio visual materials*

6   …." 18 U.S.C. § 2710(a)(4) (emphasis added).  Thus, the plain language of the VPPA is

7   not limited to the sale or rental of "prerecorded video cassette tapes."  Indeed, multiple

8   federal courts have recognized that the VPPA's legislative history recognized

9   "'Congress' intent to cover new technologies for pre-recorded video content.'"  *Louth v.*

10  *NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (quoting *In re*

11  *Hulu Privacy Litig.*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (Beeler, Mag.

12  J.) ("The court concludes that Congress used 'similar audio visual materials' to ensure

13  that VP[P]A's protections would retain their force even as technologies evolve.")

14  (quoting S. Rep. 100–599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1; 1988 WL

15  243503, at *12) (discussing "similar audio visual materials, such as laser discs, open-reel

16  movies, or CDI technology")).  Indeed, Defendant acknowledges that the VPPA covers

17  *new technologies* including "current video streaming technology," for the delivery of

18  pre-recorded video content.  (Def.'s Mem. at 1:14.)  Although Defendant implies that the

19  VPPA should be interpreted as limited to online providers of streaming videos, (Def.'s

20  Mem. at 1:14; 2:3-4), Defendant ignores that courts have recognized that "Congress's use

21  of the phrase 'similar audiovisual materials' indicates that *the definition is medium-*

22  *neutral*; the defendant must be in the business of delivering video content, *but that*

23  *content need not be in a particular format*."  *In re Vizio, Inc. Consumer Privacy Litig.*,

24  238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (emphasis added).  Notably, Defendant has

25  cited *In re Vizio* for other reasons.  (Def.'s Mem. at 5:14-15; 6:2-7.)  Thus, Defendant is

26  surely well aware of its holding in this regard.

27      Second, numerous federal courts have interpreted the term, "video tape service

28  provider," as including commercial website owners/operators.  *See, e.g.*, *Belozerov v.*

*Gannett Co., Inc.*, - F. Supp. 3d -, 2022 WL 17832185, at \*3 (D. Mass. Dec. 20, 2022); *Czarnionka v. The Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at \*4 (S.D.N.Y. Nov. 17, 2022) (noting complaint's allegation that owner/operator of theepochtimes.com delivers audiovisual materials including "news programs, television shows, documentaries, movies, and other audiovisual content"); *Lebakken v. WebMD, LLC*, 2022 WL 16716151, at \*1, \*3 & n.2 (N.D. Ga. Nov. 4, 2022) (noting allegation that owner/operator of WebMD.com provides "online health information and medical news"); *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at \*2 (D. Mass. Sept. 19, 2022) (noting allegation that bostonglobe.com "is engaged in the business of delivering various types of video content"); *Louth*, 2022 WL 4130866, at \*4 (denying motion to dismiss as to pre-recorded content on NFL mobile application); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 798-99 (N.D. Cal. 2019) (Chhabria, J.) (denying motion to dismiss regarding Facebook's website); *Cappello v. Walmart Inc.*, 2019 WL 11687705, at \*2 (N.D. Cal. Apr. 5, 2019) (Seeborg, J.) (denying motion to dismiss regarding walmart.com); *Yershov v. Gannett Satellite Info Network, Inc.*, 820 F.2d 482, 485 n.1 (1st Cir. 2016) (noting that defendant operator of USA Today Mobile App failed to challenge sufficiency of complaint alleging it to be a "video tape service provider"); *In re Hulu Privacy Litig.*, 2012 WL 3282960 at \*6 (rejecting argument that VPPA does not cover streaming service purportedly because VPPA does not expressly cover digital distribution).

Such decisions should be treated as persuasive based on their reasoning. Defendant is "engaged in the business of delivering computer files containing video content, which are 'similar audio visual materials' to prerecorded cassette tapes." *Belozerov*, 2022 WL 17832185, at \*3; (*see* Compl. ¶ 29). That suffices. Notably, Defendant's Memorandum omits addressing *Belozerov*, which speaks volumes.

Although Defendant contends that a company like itself, which is a hair products retailer that sells clip-in hair extensions, (Def.'s Mem. at 1:26; 6:20; Compl. ¶ 5), should not be viewed as a "video tape service provider" because its primary function is not to

sell, rent, or deliver audio visual materials, *id.* at 5:23-24; 6:19-21, the VPPA's language does not exclude such provider.  There is nothing in the plain language of the VPPA statute imposing a "primary function" limitation or limiting the definition to a business engaged in a media business or actually selling or renting video media.

Furthermore, Defendant's reliance upon *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017), is misplaced.  Although the court therein stated that "'business' connotes 'a particular field of endeavor,' *i.e.*, a focus of the defendant's work," *id.* at 1221, as used in 18 U.S.C. § 2710(a)(4), the court also stated that "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose."  *Id.* at 1221.  Notably, the court then cited an example of "a letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox," as not engaged in the "business" of delivering video content because "her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package."  *Id.*  The court then held that "Plaintiffs plausibly allege that Vizio's Internet Apps and Internet Apps Plus are designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their homes."  *Id.* at 1222.  In support, the court noted in relevant part that "these Smart TVs are designed to stream video content through Vizio's Internet Apps and Internet Apps Plus software."  *Id.*  Much like the Smart TVs at issue in *In re Vizio* were designed to stream video content via Internet-connected software, Defendant's website at https://www.luxyhair.com (the "Website"), which is owned, operated, and controlled by Defendant, (Compl. ¶ 6), is designed to display audio visual materials constituting videos on its Website to visitors of such Website.  (Compl. ¶¶ 14-15.)  Indeed, the Complaint alleges that Defendant's business model involves using pre-recorded videos to promote and monetize its products.  *Id.* ¶ 14.  Thus, Defendant's design and operation of its Website is much closer to the Smart TV manufacturer in *In re Vizio* than the letter carrier hypothetical cited therein.  That is, Defendant is "substantially involved in the conveyance of video content to

consumers [and its Website is] significantly tailored to serve that purpose." *In re Vizio*, 238 F. Supp. 3d at 1221.

Additionally, Defendant's reliance upon *Stark v. Patreon, Inc.*, - F. Supp. 3d -, 2022 WL 7652166, at *7 (N.D. Cal. Oct. 13, 2022), is misplaced.  Although Defendant correctly points out that "Plaintiffs have alleged that they paid Patreon subscription fees to watch videos on its website," *id.*, Defendant has failed to cite the rest of *Stark*'s analysis whereby the court also noted:

> "***[I]t is reasonable to think that developing a website to deliver video content requires more significant 'tailor[ing] to serve that purpose' than a package delivery service shipping videocassettes along with other physical goods***.  *See id.* at 1221.  That third-party 'creators' may also be involved in developing and delivering the videos at issue does not absolve Patreon of liability—'a defendant can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content.'  *Id.*  Nothing in Patreon's terms of use or other policies offered for judicial notice dispels the inference that Patreon 'delivers' videos through its platform, even if those videos are created by third parties."

*Stark*, 2022 WL 7652166, at *7 (emphasis added).  Thus, if anything, *Stark* supports Plaintiff's position that developing a website to deliver video content requires far more "tailoring" to serve that purpose than a letter carrier shipping video cassettes or DVDs and other physical goods to consumers.

Finally, Defendant's dire prediction that Plaintiff's interpretation of a "video tape service provider" defines such term too broadly such that it "would allow any consumer to sue any defendant for any perceived invasion of privacy," (Def.'s Mem. at 1:12-14), is wrong.  For example, website owners/operators with no commercial interest (such as a non-profit entity) are clearly beyond the scope of the VPPA.  That is why the VPPA has defined the "video tape service provider" to "any person, engaged in the business, in or affecting ***interstate or foreign commerce***," as part of its definition.   18 U.S.C. § 2710(a)(4) (emphasis added).

### 2.   Plaintiff Is a "Consumer" as Defined by the VPPA.

The VPPA defines the term "consumer" to mean "any renter, purchaser, or ***subscriber*** of goods or services from a video tape service provider."  18 U.S.C. §

2710(a)(1) (emphasis added).  Notably, the VPPA does not define the meaning of the term, "subscriber."  Plaintiff is a "subscriber" of services from a "video tape service provider".  (Compl. ¶ 21; Doc. 1-2.)  The Complaint alleges that "Plaintiff subscribes to Defendant's newsletter."  *Id.*  This allegation suffices to make Plaintiff a "subscriber" of "services" from a "video tape service provider."  18 U.S.C. § 2710(a)(1).

First, as explained by the Eleventh Circuit, "payment is not a necessary element of subscription."  *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015).  "The term 'subscriber' is not preceded by the word 'paid' in § 2710(a)(1) of the VPPA, and there are numerous periodicals, newsletters, blogs, videos, and other services that a user can sign up for (i.e., subscribe to) and receive for free."  *Ellis*, 803 F.3d at 1256 (citing *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *8).  Multiple federal courts besides the Eleventh Circuit in *Ellis* have recognized that monetary payment for using a website is not viewed as required to satisfy the "consumer" element of the VPPA.  *Belozerov*, 2022 WL 17832185, at *3 (citing *Yershov* as "declin[ing] to interpret the [VPPA] as incorporating monetary payment as a necessary element"); *Yershov*, 820 F.3d at 487 ("Congress would have had no need to include a third category of persons protected under the Act [besides "renter" and "purchaser"] if it had intended that only persons who pay money for videos be protected, which militates against an interpretation of the statute incorporating such an element."); *id.* at 488 ("we … decline to interpret the statute as incorporating monetary payment as a necessary element").  Thus, Defendant's repeated implicit argument that its Website is free, (Def.'s Mem. at 3:5; 3:14; 8:10), is not dispositive of the "subscriber" meaning.

Second, the Court should follow the First Circuit's persuasive decision in *Yershov v. Gannett Satellite Info Network, Inc.*, 820 F.3d 482, 487 (1st Cir. 2016).  In *Yershov*, the First Circuit squarely addressed the question whether the complaint adequately alleged facts plausibly establishing whether an individual is a "consumer" in relation to the defendant, the latter of which was the operator of USA Today Mobile App.  *Id.* at 487.  Notably, the First Circuit relied upon a dictionary definition that was "[m]ore on

point technologically" than other dictionary definitions because it "defines 'subscribe' as '[t]o receive or be allowed to access electronic texts or services by subscription' with 'subscription' defined, in turn, to include '[a]n agreement to receive or be given access to electronic texts or services.'"  *Id.* at 487 (quoting The American Heritage Dictionary 1726 (4th ed. 2000)).  The First Circuit then applied such definition to the alleged facts:

> "This is just what we have here:  [Defendant] offered and [Plaintiff] accepted [Defendant's proprietary mobile device application as a tool for directly receiving access to [Defendant's] electronic text and videos without going through other distribution channels, much like how a newspaper subscriber in 1988 could, if he wished, retrieve a copy of the paper in a box at the end of his driveway without having to go look for it at a store."

820 F.3d at 487.  Although *Yershov* recognized that "there are other common definitions of the term 'subscribe' that include as an element a payment of some type and/or presume more than a one-shot transaction," 820 F.3d at 487, *Yershov* concluded that "***[p]laintiff's decision to download the App seems a fair enough indication that he intended more than a one-shot visit***."  *Id.* (emphasis added).

Notably, *Yershov* comprehensively considered the Eleventh Circuit's decision in *Ellis* regarding the interpretation of "subscriber" in the VPPA, but disagreed with it.  820 F.3d at 488-89.  *Ellis* relied upon and agreed with the district court decision in *Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135 (D. Mass. 2015), *rev'd*, 820 F.3d 482 (1st Cir. 2016), the latter of which had held mere users of the USA Today mobile app were not "subscribers" within the VPPA's definition of consumer because subscriptions involve either "payment, registration, commitment, delivery [] or access to restricted content."  *Yershov*, 104 F. Supp. 3d at 147-48; *Ellis*, 803 F.3d at 1256 ("We find [the district court decision in] *Yershov* persuasive and conclude it is the better reasoned of the existing opinions on the issue [interpreting the term 'subscriber' in the VPPA].").  The First Circuit explained why it disagreed with *Ellis* in relevant part as follows:

> "We would describe the allegations (and their reasonable inferences) in this case quite differently. To use the App, ***[Plaintiff] did indeed have to provide [Defendant] with personal information***, such as his Android ID … at the time he viewed a video, … linked to his viewing selections. ***While he paid no money,***

*access was not free of a commitment to provide consideration in the form of that information, which was of value to [Defendant]*. And by installing the App on his phone**, thereby establishing seamless access to an electronic version of USA Today, [Plaintiff] established a relationship with [Defendant] that is materially different from what would have been the case had** *USA Today* **simply remained one of millions of sites on the web that [Plaintiff] might have accessed through a web browser**.

*Ellis*, like the district court, also presumed that downloading a mobile device application 'is the equivalent of adding a particular web site to one's Internet browser as a favorite.' *Id.* at 1257. We do not think that such a presumption is so apparently true as to dictate our reading of the complaint, which concedes no such equivalence. Why, after all, did [Defendant] develop and seek to induce downloading of the App? And it is by no means self-evident that the version of USA Today one accesses with a browser is identical in all respects to the electronic version one accesses with the App.

Our conclusion is further informed by positing a non-electronic version of the electronic relationship between [Plaintiff] and [Defendant]. Imagine that [Defendant] had installed a hotline at [Plaintiff's] home, for free, allowing him to call [Defendant] and receive instant delivery of videos in exchange for his name and address, and he then used the hotline over the course of many months to order videos. We doubt that Congress would have intended that [Defendant] would have been free in such a scenario to publish [Plaintiff's] PII by claiming that he was not a purchaser, renter, or subscriber. This physical world hypothetical is admittedly unrealistic, but only because installing a hotline is expensive in comparison to the value of obtaining [Plaintiff's] name and address. Here, by contrast, the marginal cost to [Defendant] of maintaining the App for [Plaintiff] and electronically allowing him to access its video content through it may well be less than the value to [Defendant] of having [Plaintiff] use the App and provide his PII. We see nothing in these differences, though, to find [Plaintiff] to be a subscriber in one scenario and not the other.'

*Yershov*, 820 F.3d at 489 (emphasis added). *Yershov* then held that "the transaction described in the complaint--whereby [plaintiff] used the mobile device application that [defendant] provided to him, which gave [defendant] [plaintiff's] device identifier, and the titles of the videos he viewed in return for access to [defendant's] video content-- plausibly pleads a case that the VPPA's prohibition on disclosure applies." *Id.*

Here, although there is no downloading of any mobile application at issue, this Court can and should infer that by signing up to receive Defendant's online newsletter, Plaintiff necessarily provided her email address, which is indisputably personal information, to Defendant. (Compl. ¶ 21); (*see also* Def.'s Mem. at 3:16-24) ("Luxy allows a visitor to voluntarily submit an email address to receive promotional materials."); Def.'s RJN at 2:22-23 (same); Doc. 4-3; Pg. 3 of 5; PageID.106; Schmidt Decl. Ex. A; Doc. 4-2; Pg. 7 of 8; PageID.102; *Barker v. Riverside County Office of Education*, 584 F.3d 821, 824 (9th Cir. 2009) ("we must draw inferences in the light most

favorable to the plaintiff") (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Plaintiff's decision to sign up for Defendant's email list serve in exchange for receiving Defendant's promotional emails with both hair tips, promotions, and marketing information intended to advertise Defendant's hair-related products, (Def.'s Mem. at 3:16-24), **by providing her email address to Defendant** is sufficiently analogous to downloading a mobile application to indicate an intention of "more than a one-shot visit" to Defendant's Website. *Yershov*, 820 F.3d at 487. Thus, contrary to Defendant's argument, (Def.'s Mem. at 8:18-20), the Complaint's allegation about signing up for Defendant's promotional newsletter is not a "red herring" at all.

Notably, Defendant's meager attempt, if at all, to distinguish *Yershov* is unpersuasive. Defendant characterizes *Yershov* as involving a fact pattern in which the "subscriber" relationship allegations were deemed plausible because the "defendant's video content could only be accessed after the user provided defendant their personal information, such as their Android ID and mobile device's GPS location." (Def.'s Mem. at 8:23-26.) *Yershov* correctly recognized the significance of the exchange based upon the consumer providing "personal information" to the defendant.

In addition, Defendant makes no attempt to distinguish, let alone, address *Belozerov*, 2022 WL 17832185, at *2 (noting that plaintiff has an unpaid digital subscription in which plaintiff provided his name and email address); *id.* at *3 (citing *Yershov* as "declin[ing] to interpret the [VPPA] as incorporating monetary payment as a necessary element"). *Belozerov* is directly on point. Defendant's omission speaks volumes.

Additionally, Defendant makes no attempt to distinguish *Lebakken*, 2022 WL 16716151, at *2 (finding that the plaintiff had adequately pleaded that she was a subscriber under the VPPA by alleging that she "exchanged her email address to receive the WebMD e-newsletter and that she also created her own WebMD account"), in the specific context of addressing whether the Complaint sufficiently pleads that Plaintiff is a "subscriber" under the VPPA. Defendant's omission speaks volumes.

Furthermore, the VPPA does not define or restrict the meaning of the term, "subscriber," to a person who subscribes to services by a particular method or location. Nor does the VPPA define or limit such term to a person who subscribes to any services *constituting audio visual materials*.  Instead, such term is undefined and unlimited.  "As a 'broad remedial statute,' the [VPPA] must be liberally construed in favor of the consumer in order to effectuate this goal of eliminating abuse." *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1078-79 (9th Cir. 2016) (internal citation omitted).[2]  "[T]he phrase 'goods or services' is generally construed broadly to encompass 'all parts of the economic output of society.'" *Lebakken*, 2022 WL 16716151, at *3.  The Court should reject Defendant's attempt to read into the VPPA's plain language an interpretation that is unsupported.

Defendant's reliance upon *Austin-Spearman v. AMC Network Enter. LLC*, 98 F. Supp. 3d 662, 671 (S.D.N.Y. 2015), is misplaced.   The court therein noted, "Conventionally, 'subscription' entails an exchange between subscriber and provider whereby the subscriber imparts money and/*or personal information* in order to receive a *future and recurrent benefit*, whether that benefit comprises, for instance, periodical magazines, club membership, cable services, *or email updates*." *Id.* at 669 (emphasis added).  The court explained further:

> "Whatever the nature of the specific exchange, what remains is the subscriber's deliberate and durable affiliation with the provider: *whether or not for payment*, these arrangements necessarily require some sort of *ongoing relationship between provider and subscriber*, one generally undertaken in advance and by affirmative action on the part of the subscriber, so as to supply the provider with sufficient *personal information* to establish the relationship and exchange."

*Id.* (emphasis added).  The court held that the plaintiff therein failed to claim any such relationship with the defendant in her VPPA complaint.  *Id.*  Notably, the plaintiff did not "sign up".  *Id.*  Thus, if anything, *Austin-Spearman* supports Plaintiff's position by

---

[2] *See also Leader v. Cords*, 182 Cal. App. 4th 1588, 1598 (2010) ("A remedial statute ' 'must be liberally construed 'to effectuate its object and purpose, and to suppress the mischief at which it is directed.' [Citations.]' '") (citations omitted); *cf. Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016)(quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002) and citing *Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985)).

1  recognizing that signing up for email updates is a conventional interpretation of
2  subscription to be applied under the VPPA.

3      Plaintiff anticipates that in its Reply, Defendant shall rely upon *Carter v. Scripps*
4  *Networks, LLC*, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023), but such reliance would be
5  misplaced because it is unpersuasive for several reasons.  First, *Carter* ignores the well-
6  established rule that a plain meaning analysis applies to statutory interpretation if there is
7  no ambiguity in the statutory language.  *Connecticut Nat'l Bank v. Germain*, 503 U.S.
8  249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is
9  also the last:  'judicial inquiry is complete.'") (citation omitted).  Simply put, the statutory
10  text is clear that the VPPA defines the term "consumer" to mean "any renter, purchaser,
11  or ***subscriber*** of goods or services from a video tape service provider."  18 U.S.C. §
12  2710(a)(1) (emphasis added).  The VPPA does not define or restrict the meaning of the
13  term, "subscriber," to mean "subscribers to audio visual materials," as held in *Carter*.
14  2023 WL 3061858, at *6.

15      As mentioned above, "[T]he phrase 'goods or services' is generally construed
16  broadly to encompass 'all parts of the economic output of society.'" *Lebakken*, 2022 WL
17  16716151, at *3.  Indeed, *Carter* itself acknowledges, "The statute does not limit or
18  qualify 'goods or services' to video materials." *Carter*, 2023 WL 3061858, at *5.  Given
19  the foregoing acknowledgment in *Carter*, its resort to a statutory interpretation going
20  beyond the plain meaning of the statutory language was improper.

21      Second, *Carter* erred by failing to liberally construe the VPPA, whose purpose is
22  to protect the privacy rights of individuals.  *Hernandez*, 829 F.3d at 1078-79.

23      Notably, *Carter* made no attempt to interpret the "subscriber" term in the VPPA
24  broadly in furtherance of Congress's goal to protect the privacy rights of individuals.
25  Instead, *Carter*'s extremely narrow interpretation of a "subscriber" surely frustrates the
26  privacy-related goal underlying the VPPA's enactment.

27  **B.    If a Curable Defect Remains, Leave to Amend Should Be Granted.**

28      If the Court is inclined to grant the instant Motion due to a curable pleading

- 11 -

deficiency, this Court can and should grant Plaintiff leave to amend. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); Fed. R. Civ. P. Rule 15(a)(2).

Dated:  May 26, 2023                          PACIFIC TRIAL ATTORNEYS, P.C.

By:  */s/ Scott J. Ferrell*
Scott. J. Ferrell
Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on May 26, 2023, I electronically filed the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS PLAINTIFF'S COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.


Dated:  May 26, 2023


<em>/s/ Scott J. Ferrell</em><br>Scott J. Ferrell