**PACIFIC TRIAL ATTORNEYS**
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Suite 800
Newport Beach, California 92660
Telephone: (949) 706-6464
Facsimile: (949) 706-6469

Attorneys for Plaintiff

## UNITED STATE DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

REBEKA RODRIGUEZ, individually and on behalf of all others similarly situated,

    Plaintiff,

  v.

THE HERSHEY COMPANY, a Delaware corporation; and DOES 1 through 10, inclusive,

    Defendants.

Case No. 3:23-cv-00657-L-BLM

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS CLASS ACTION COMPLAINT**

[Declaration of Scott J. Ferrell; Response to Def.'s RJN; and Evidentiary Objection filed concurrently herewith]

Date:   June 19, 2023
Time:   10:30 a.m.
Courtroom: 5B
Judge:  Hon. M. James Lorenz

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION .......................................................................................... 1

II. ARGUMENT ................................................................................................. 1

    A.  The Complaint Sufficiently Pleads Article III Standing. ........................... 1

        1.  Plaintiff's VPPA Injury to Her Dignity Is Concrete. ......................... 1

        2.  The Complaint Has Sufficiently Alleged an Injury to Plaintiff's Dignity That Is "Fairly Traceable" to Defendant's Conduct. ............ 2

        3.  The Pre-Filing Demand Letter and Draft Complaint Were Intended to Address the Claims of Other Individuals. ...................................... 6

        4.  Defendant Has Failed to Show that Plaintiff Consented to the Disclosure of Her Video Watching Behavior on Defendant's Website. ............................................................................................... 6

    B.  The Court Should Not Dismiss for Lack of Personal Jurisdiction. .............. 8

        1.  California Follows the Sliding Scale Approach Described in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* ....................................................... 8

        2.  The Court Can and Should Infer that Defendant's Website Is Interactive. ......................................................................................... 9

            a.  Defendant's Website Has Numerous Interactive Features. ...... 9

            b.  Defendant's Website Is Both Highly Interactive and Commercial Especially Because It Functions as a Gateway that Funnels Customers to Defendant's Online Store. ............ 9

            c.  The Court Should Defer Ruling on Personal Jurisdiction Grounds Until After Plaintiff Has Had an Opportunity to Conduct Limited Jurisdictional Discovery. ........................... 10

    C.  The Complaint Sufficiently Pleads a VPPA Claim. .................................... 11

        1.  Defendant Is a "Video Tape Service Provider" Under the VPPA. ... 11

        2.  Plaintiff Is a "Consumer" as Defined by the VPPA. ...................... 15

3.    The Complaint Sufficiently Alleges Defendant's Disclosure of Plaintiff's Personally Identifiable Information to Facebook and Defendant's Knowledge of Such Disclosure. ................................. 18

a.    The VPPA Defines PII to Include the Title, Description, and Subject Matter of Videos. ....................................... 18

b.    The Complaint's Allegations that Defendant Knowingly Disclosed Plaintiff's PII to Facebook Is Plausible. ............... 20

c.    The Facebook ID Depicted in Various Figures Belongs to Plaintiff's Expert. .................................................... 22

d.    *Martin v. Meredith Corp.* Is Distinguishable. ...................... 22

D.    If a Curable Defect Remains, Leave to Amend Should Be Granted. ......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ambrose v. Boston Globe Media Partners LLC*,
2022 WL 4329373 (D. Mass. Sept. 19, 2022) ....................................... 13, 21, 22

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................... 16

*Austin-Spearman v. AMC Network Enter. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015) ................................................. 18

*Backer ex rel. Freedman v. Shah*,
788 F.3d 341 (2d Cir. 2015) .............................................................. 4

*Barclift v. Keystone Credit Servs., LLC*,
585 F. Supp. 3d 748 (E.D. Pa. 2022) ................................................ 2

*Barker v. Riverside County Office of Education*,
584 F.3d 821 (9th Cir. 2009) ........................................................ 16, 25

*Batts v. Gannett Co.*,
2023 WL 3143695 (E.D. Mich. Mar. 30, 2023) ................................ 2

*Bayer v. Neiman Marcus Group, Inc.*,
861 F.3d 853 (9th Cir. 2017) ............................................................ 4

*Beard v. John Hiester Chevrolet, LLC*,
- F. Supp. 3d -, 2022 WL 16840332, at *4 (E.D.N.C. Nov. 9, 2022),
*appeal docketed*, No. 22-2162 (4th Cir. Nov. 14, 2022) ...................... 2

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 21

*Belozerov v. Gannett Co., Inc.*,
- F. Supp. 3d -, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022) 12, 13, 21, 22

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ......................................................................... 8

*Burgess v. United States*,
553 U.S. 124 (2008) ......................................................................... 19

*Byars v. Sterling Jewelers, Inc.*,
    2023 WL 2996686 (C.D. Cal. Apr. 5, 2023) .......................................................4

*Byars v. Sterling Jewelers, Inc.*,
    No. 5:22-cv-01456-SB-SP, Doc. 52 (C.D. Cal. May 18, 2023) ..........................4

*Campbell v. Facebook, Inc.*,
    951 F.3d 1106 (9th Cir. 2020) ...............................................................................4

*Cappello v. Walmart Inc.*,
    2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) (Seeborg, J.) ..............................13

*Carter v. Scripps Networks, LLC*,
    2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023) ..............................................16, 17

*Civil Rights Educ. and Enforcement Center v. Hospitality Props. Trust*,
    867 F.3d 1093 (9th Cir. 2017) ...............................................................................4

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...............................................................................................3

*Connecticut Nat'l Bank v. Germain*,
    503 U.S. 249 (1992) .............................................................................................17

*Czarnionka v. The Epoch Times Ass'n, Inc.*,
    2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ..................................... 12, 21, 22

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) ....................................................................... *passim*

*Federal Election Cmm'n v. Akins*,
    524 U.S. 11 (1998) .................................................................................................1

*Federal Election Comm'n v. Cruz*,
    142 S. Ct. 1638 (2022) ...........................................................................................3

*Feldman v. Star Tribune Media Company LLC*,
    2023 WL 2388381 (D. Minn. Mar. 7, 2023) .................................................21, 22

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .......................................................................................3, 4, 5

*Hernandez v. Williams, Zinman & Parham PC*,
    829 F.3d 1068 (9th Cir. 2016) .........................................................................16, 17

- iv -

*Huffaker v. Eagle Fuel Cells, Inc.*,
  2020 WL 515977 (S.D. Cal. Jan. 31, 2020) (Curiel, J.) ....................................10

*In re Borders Group, Inc.*,
  2011 WL 5520261 (Bankr. S.D.N.Y. Sept. 27, 2011)........................................20

*In re Facebook, Inc., Consumer Privacy User Profile Litig.*,
  402 F. Supp. 3d 767 (N.D. Cal. 2019).....................................................2, 13, 18

*In re Hulu Privacy Litig.*,
  2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (Beeler, Mag. J.) .......12, 13

*In re Hulu Privacy Litig.*,
  2013 WL 6773794 (N.D. Cal. Dec. 20, 2013).....................................................1

*In re Hulu Privacy Litig.*,
  2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ...................................... 18, 21, 22

*In re Vizio, Inc. Consumer Privacy Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) ...................................................... *passim*

*Karczewski v. DCH Mission Valley LLC*,
  862 F.3d 1006 (9th Cir. 2017) ...........................................................................20

*Lang v. Morris*,
  823 F. Supp. 2d 966 (N.D. Cal. 2011) ...............................................................10

*Langer v. Kiser*,
  57 F.4th 1085 (9th Cir. 2023) .............................................................................4

*Lebakken v. WebMD, LLC*,
  2022 WL 16716151 (N.D. Ga. Nov. 4, 2022) ........................................... *passim*

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) ...........................................................................25

*Louth v. NFL Enterprises LLC*,
  2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022)........................................12, 13

*Magee v. Coca-Cola Refreshments USA, Inc.*,
  833 F.3d 530 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017)......................20

*Martin v. Meredith Corp.*,
  - F. Supp. 3d -, 2023 WL 2118074, at *4 (S.D.N.Y. Feb. 17, 2023),
  *appeal docketed*, No. 23-412 (2d Cir. Mar. 17, 2023) .................... 22, 23, 24, 25

*Matera v. Google Inc.*,
   2016 WL 8200619 (N.D. Cal. Aug. 12, 2016) ...................................................16

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ...........................................................................7

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998).............................................................................................1

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974)..........................................................................................25

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)............................................................................................2

*Stark v. Patreon, Inc.*,
   - F. Supp. 3d -, 2022 WL 7652166 (N.D. Cal. Oct. 13, 2022) ........ 14, 15, 21, 22

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) .........................................................................16

*Stasi v. Inmediata Health Group Corp.*,
   501 F. Supp. 3d 898 (S.D. Cal. 2020) (Miller, J.) ...............................................2

*Sterk v. Redbox Automated Retail, LLC*,
   770 F.3d 618 (7th Cir. 2014) ..............................................................................2

*Stoops v. Wells Fargo Bank, N.A.*,
   197 F. Supp. 3d 782 (W.D. Pa. 2016)...........................................................4, 5, 6

*Symettrica Enter., Ltd. v. UMG Recordings, Inc.*,
   2019 WL 8806093 (C.D. Cal. Sept. 20, 2019) (Carney, J.) ...............................10

*Tourgeman v. Collins Financial Servs., Inc.*,
   755 F.3d 1109 (9th Cir. 2014) .......................................................................3, 4

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)........................................................................................2

*United States v. Angelilli*,
   660 F.2d 23 (2d Cir. 1981).................................................................................19

*Wilson v. Huuuge, Inc.*,
   944 F.3d 1212 (9th Cir. 2019) ...........................................................................7

*World–Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980) ..................................................................................8, 9

*Yates v. United States*,
    574 U.S. 528 (2015) ......................................................................................20

*Yershov v. Gannett Satellite Info Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016) ................................................................13, 19

*Yoon v. Lululemon USA, Inc.*,
    549 F. Supp. 3d 1073 (C.D. Cal. 2021) (Holcomb, J.) ...............................7

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.*
    952 F. Supp. 1119 (W.D. Pa. 1997) ...........................................8, 9, 11

**California Cases**

*Flanagan v. Flanagan*,
    27 Cal. 4th 766 (2002) ................................................................................16

*Friddle v. Epstein*,
    16 Cal. App. 4th 1649 (1993) ..................................................................1, 4

*Leader v. Cords*,
    182 Cal. App. 4th 1588 (2010) ..................................................................16

*Long v. Provide Commerce, Inc.*,
    245 Cal. App. 4th 855 (2016) ......................................................................7

*Ribas v. Clark*,
    38 Cal. 3d 360-61 (1985) ...........................................................................16

*Sellers v. Just Answer LLC*,
    73 Cal. App. 5th 444 (2021) .........................................................................7

*Smith v. LoanMe, Inc.*,
    11 Cal. 5th 183 (2021) ..................................................................................1

*Thurston v. Fairfield Collectibles of Georgia, LLC*,
    53 Cal. App. 5th 1231 (2020), *review denied*, No. S264780 (Dec. 9,
    2020) ...................................................................................................9, 11

**U.S. Constitution**

Article III ...................................................................................................1, 2

**Federal Statutes**

18 U.S.C.
§ 2710 *et seq.* ........................................................................1
§ 2710(a)(1) ............................................................ 15, 17, 18
§ 2710(a)(3) ............................................................ 18, 24, 25
§ 2710(a)(4) ............................................................ 11, 14, 15
§ 2710(b) ................................................................................22
§ 2710(b)(1) ............................................................................2
§ 2710(b)(2)(D) ....................................................................19
§ 2710(b)(2)(D)(ii) ...............................................................25
§ 2710(c)(l) ............................................................................1
Video Privacy Protection Act ......................................... *passim*

47 U.S.C.
§ 227 *et seq.* ..........................................................................5
§ 227(b)(3) ..............................................................................5
Telephone Consumer Protection Act ...............................5, 6

Americans with Disabilities Act ..............................................4

Fair Housing Act .......................................................................5

**California Statutes**

Cal. Penal Code
§ 631(a) ...................................................................................4
§ 632.7 ....................................................................................4

**Federal Rules**

Federal Rules of Civil Procedure
Rule 8(a) ...............................................................................15
Rule 12(b)(6) ...................................................................16, 21
Rule 15(a)(2) ........................................................................25
Rule 26(f) ..............................................................................11

**Other Authorities**

13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Fed.
    Prac. & Proc. Juris. (3d ed. Apr. 2022 Update)
§ 3531.5 ...................................................................................3
n.61 ..........................................................................................3

n.70 ..................................................................................................3, 4

n.73 ..................................................................................................3

30 FCC Rcd. at 8011, 8091, ¶ 95 ....................................................................6

S. Rep. 100-599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1; 1988
    WL 243503 ...............................................................................12, 19

MEM ISO RESPONSE TO MTD                                    No. 3:23-cv-00657-L-BLM

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Although Defendant contends that Plaintiff's interpretation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710 *et seq.*, was never intended by Congress, (Def.'s Mem. at 3:1-2), Defendant ignores that statutory prohibitions "often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed," *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 198-99 (2021) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).  Multiple federal courts have held that similar claims were plausibly alleged.  Here, the allegations in the Complaint are robust.  As such, the Motion to Dismiss should be denied in its entirety.

## II.    ARGUMENT

**A.    The Complaint Sufficiently Pleads Article III Standing.**

**1.    Plaintiff's VPPA Injury to Her Dignity Is Concrete.**

The VPPA expressly provides that "[a]ny person *aggrieved* by any act of a person in violation of this section may bring a civil action in a United States district court."  18 U.S.C. § 2710(c)(l) (emphasis added). "History associates the word 'aggrieved' with a congressional intent to cast the standing net broadly—beyond the common-law interests and substantive statutory rights upon which 'prudential' standing traditionally rested." *Federal Election Cmm'n v. Akins*, 524 U.S. 11, 19 (1998).

Plaintiff's dignitary interest is intended to be protected by the VPPA.  *Friddle v. Epstein*, 16 Cal. App. 4th 1649, 1660-61 (1993) ("*Any invasion of privacy involves an affront to human dignity*") (emphasis added).  Thus, Plaintiff need only plead an injury in the form of a wrongful disclosure.  *In re Hulu Privacy Litig.*, 2013 WL 6773794, at *5 (N.D. Cal. Dec. 20, 2013).

The Ninth Circuit's decision in *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017), is directly on point.  *Eichenberger* held that the "VPPA ... protects privacy interests ... by ensuring that consumers retain control over their personal information."  *Id.* at 983

(citing VPPA's legislative history).  *Eichenberger* held "the VPPA identifies a *substantive* right to privacy that suffers *any time* a video service provider discloses otherwise private information.  As a result, every 18 U.S.C. § 2710(b)(1) violation 'present[s] the precise harm and infringe[s] the same privacy interests Congress sought to protect' by enacting the VPPA."  876 F.3d at 983-84 (emphasis in original). *Eichenberger* held that *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), was distinguishable, and that "Plaintiff need not allege any further harm to have standing."  876 F.3d at 984 ("We … join the two other circuits that, after *Spokeo I*, have found Article III standing in similar cases arising under the VPPA."); *Stasi v. Inmediata Health Group Corp.*, 501 F. Supp. 3d 898, 909 (S.D. Cal. 2020) (Miller, J.) ("the Ninth Circuit has found, in near uniformity, that intangible injuries based on alleged violations of privacy-related statutes are sufficiently concrete"); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (recognizing that "disclosure of private information" is concrete intangible harm);[1] *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014) ("'technical' violations of the statute (*i.e.*, impermissible disclosures of one's sensitive personal information) are precisely what Congress sought to illegalize by enacting the VPPA"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 786 (N.D. Cal. 2019) ("To say that a 'mere' privacy invasion is not capable of inflicting an 'actual injury' serious enough to warrant the attention of the federal courts is to disregard the importance of privacy in our society, not to mention the historic role of the federal judiciary in protecting it.").

**2.    The Complaint Has Sufficiently Alleged an Injury to Plaintiff's**

---

[1] *TransUnion LLC* did nothing to alter *Spokeo*.  The main gist of *TransUnion*'s holding is that "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III . . . ."  *TransUnion*, 141 S. Ct. at 2205. "*TransUnion* did not expand this principle, but rather explained and reaffirmed *Spokeo*." *Beard v. John Hiester Chevrolet, LLC*, - F. Supp. 3d -, 2022 WL 16840332, at *4 (E.D.N.C. Nov. 9, 2022), *appeal docketed*, No. 22-2162 (4th Cir. Nov. 14, 2022); *Batts v. Gannett Co.*, 2023 WL 3143695, at *3 (E.D. Mich. Mar. 30, 2023) ("*TransUnion* merely reiterates the canons of *Spokeo*[.]"); *Barclift v. Keystone Credit Servs., LLC*, 585 F. Supp. 3d 748, 754 (E.D. Pa. 2022) ("The holding in *TransUnion* is not new.").

**Dignity That Is "Fairly Traceable" to Defendant's Conduct.**

As the Ninth Circuit has explained, "[w]hen the injury in fact is the violation of a statutory right that we inferred from the existence of a private cause of action, causation and redressability'—the two other elements of standing—'will usually be satisfied.'" *Tourgeman v. Collins Financial Servs., Inc.*, 755 F.3d 1109, 1116 (9th Cir. 2014) (citation omitted). Although Defendant challenges the causal connection between Plaintiff's injury to her dignity and Defendant's alleged wrongdoing by arguing that Plaintiff suffered a self-inflicted injury, (Def.'s Mem. at 13:20-21), a well-recognized treatise on federal practice has explained, however, "Self-inflicted injury may seem a suspicious basis for standing. It is clear, however, that no rigid lines are drawn on this basis." 13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, Fed. Prac. & Proc. Juris. § 3531.5 (3d ed. Apr. 2022 Update) ("Wright, Miller & Cooper"). That treatise further explained, "Standing is not defeated merely because the plaintiff has in some sense contributed to his own injury." *Id.* § 3531.5 & n.70. "A self-inflicted injury defeats standing only if the injury is ***so completely due to the plaintiff's fault as to break the causal chain***." *Id.* at n.70 (emphasis added) (citation omitted); *Id.* at n.73 ("Standing is defeated only if it is concluded that the injury is ***so completely due to the plaintiff's own fault as to break the causal chain***.") (emphasis added).

Notably, such treatise cited in support as illustrative the U.S. Supreme Court's landmark decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982). Wright, Miller & Cooper, *supra*, § 3531.5 & n.61. *Havens* continues to be recognized as supporting tester standing even by the U.S. Supreme Court itself. *See Federal Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1647 (2022) (citing *Havens*) (rejecting the recognition of an exception to traceability for injuries that a party purposely incurs).[2]

---

[2] *Cruz* expressly distinguished *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), as a case in which "the plaintiffs attempted to manufacture standing by voluntarily taking costly and burdensome measures that they said were necessary to protect the confidentiality of their communications in light of the Government surveillance policy they sought to challenge," but "[t]heir problem, however, was that they could not show that they had been or were likely to be subjected to that policy in any event." 142 S. Ct. at 1647.

Also, the Ninth Circuit has repeatedly cited *Havens*.  *Langer v. Kiser*, 57 F.4th 1085, 1094 (9th Cir. 2023); *Civil Rights Educ. and Enforcement Center v. Hospitality Props. Trust*, 867 F.3d 1093, 1101-02 (9th Cir. 2017) ("*CREEC*"); *Tourgeman*, 755 F.3d at 1115-16.  Indeed, in *Langer*, the Ninth Circuit recently held that the fact that the plaintiff is a "serial litigant" "has no place in our standing analysis."  *Langer*, 57 F.4th at 1094; *CREEC*, 867 F.3d at 1096 (holding that "a plaintiff has constitutional standing" even if "her only motivation for visiting a facility is to test it for ADA compliance"); *id.* at 1102.  The mere fact that *Havens*, *Langer*, and *CREEC* are all discrimination cases is a distinction without a difference because the ***dignitary*** harm in civil rights cases,[3] is the same type of intangible harm that is at issue in all VPPA cases.  *Friddle*, 16 Cal. App. 4th at 1660-61.  Here, the injury to Plaintiff's dignity was "not solely attributable to" "[P]laintiff's actions."  Wright, Miller & Cooper, *supra*, at n.70 (citing *Backer ex rel. Freedman v. Shah*, 788 F.3d 341, 344 (2d Cir. 2015)).  Rather, the Complaint makes it clear that Defendant's unlawful conduct contributed to causing the injury either solely or almost entirely on its own.

Defendant has misconstrued *Byars v. Sterling Jewelers, Inc.*, 2023 WL 2996686, at *4 (C.D. Cal. Apr. 5, 2023), which, in analyzing a facial challenge to a plaintiff's standing to sue for violations of Cal. Penal Code §§ 631(a) and 632.7, merely made a passing remark (instead of a definitive finding) that "***it appears that*** she fully expected that her chat would be recorded so that she could file this action."  *Id.* at *4 (emphasis added).  After the plaintiff therein cited *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1118-19 (9th Cir. 2020), via a motion for reconsideration, the *Byars* court effectively abandoned its reliance upon the defendant's facial challenge in favor of the factual challenge in a subsequent order.  *See Byars v. Sterling Jewelers, Inc.*, No. 5:22-cv-01456-SB-SP, Doc. 52 at 7 (C.D. Cal. May 18, 2023).

Finally, Defendant's reliance upon *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp.

---

[3]  *See Bayer v. Neiman Marcus Group, Inc.*, 861 F.3d 853, 874 (9th Cir. 2017) (recognizing "the ***dignitary interest*** at stake when an action alleges a violation of a statute intended to safeguard civil rights") (emphasis added).

3d 782 (W.D. Pa. 2016), which addressed the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, is misplaced.  In *Stoops*, which was decided on a motion for summary judgment, the district court relied heavily on the fact that the plaintiff, who admitted during her deposition to purchasing at least 35 cell phones and cell phone numbers, *id.* at 788, 798, also admitted during such deposition that "her ***only*** purpose in using her cell phones is to file TCPA lawsuits."  197 F. Supp. 3d at 800 (emphasis added); *id.* at 801 ("Plaintiff has admitted that her ***only*** purpose in purchasing her cell phones and minutes is to receive more calls") (emphasis added).  In addition, the plaintiff testified that she intended for the calls to continue in order to recover treble statutory damages under 47 U.S.C. § 227(b)(3).  *Id.* at 800-01.  In other words, *Stoops* relied heavily upon the "extensive and undisputed admissions" including her "purchasing cell phones with the hope of receiving calls from creditors for the ***sole*** purpose of collecting statutory damages," 197 F. Supp. 3d at 805 (emphasis added), which indicated that the plaintiff had no privacy interest at stake, *id.* at 803, and that her privacy interests had not been violated by receiving calls from the defendant.  *Id.* at 805.

In contrast, the Complaint in the instant action contains no such purported admissions, and it is beyond dispute that discovery has yet to commence.  Moreover, *Stoops* did not analyze the TCPA's broad authorization for "[a] person" to sue, which, on its face, includes an individual plaintiff who is a natural person regardless of her motive. Indeed, to the extent that the court in *Stoops* failed to recognize the dignitary interest in the right to privacy infringed upon by the alleged TCPA violations at issue there, it was wrongly decided.[4]

*Stoops*, if anything, supports Plaintiff's position.  Although the defendant in *Stoops* argued that the plaintiff "manufactured" the calls and the TCPA claim at issue because she "intentionally solicited the harm from which she claims to suffer," 197 F. Supp. 3d at 791, the district court in *Stoops*, nevertheless, held that the defendant failed to meet its

---

[4] The *Stoops* court's attempt to distinguish *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (recognizing standing of a "tester" to sue for a violation of the Fair Housing Act), is unpersuasive.

burden of establishing that the plaintiff expressly consented to receiving the calls at issue and also held that the affirmative defenses of assumption of the risk and *volenti non fit injuria*, the latter of which means "he who consents cannot receive an injury," *id.* at 795, ***do not apply to the TCPA***.  *Id.* at 793.  In particular, the district court in *Stoops* relied on the FCC's 2015 Order, which rejected the existence of an affirmative, bad faith defense.  *Id.* at 794 (citing 2015 Order, 30 FCC Rcd. at 8011, 8091, ¶ 95).

### 3.     The Pre-Filing Demand Letter and Draft Complaint Were Intended to Address the Claims of Other Individuals.

Although Defendant assumes that the pre-filing demand letter dated December 19, 2022, and accompanying draft complaint, (Mazzuchetti Decl. ¶¶ 4-5 & Exs. T, U), were intended to address Plaintiff's individual claim, (Def.'s Mem. at 5:23-6:8), Defendant's assumption is mistaken.  (Ferrell Decl. ¶ 7.)  That letter and draft complaint were intended to address the claims of other individual clients of Plaintiff's counsel's law firm who watched different videos (other than the video that Plaintiff subsequently watched in February 2023).  *Id.*; (Compl. ¶ 40).

Thus, Defendant's thinly-veiled argument that Plaintiff could not have watched the "Say Hola" video on its Website in February 2023 without conclusively knowing that Defendant would violate the VPPA in light of Plaintiff's counsel's letter on behalf of other litigants is simply wrong.  (Def.'s Mem. at 11:23-12:4.)

Plaintiff acknowledges that some of the figures in the Complaint (intended merely for illustrative purposes), which is pled as a putative class action, reflect the information pertaining to a different video on Defendant's Website; if the class is certified, such images will be relevant to show that Defendant's VPPA violation is not isolated to Plaintiff's unique experience.  If the Court would like Plaintiff to substitute the images in the various figures to address the "Say Hola" video, Plaintiff is amenable to doing so.

### 4.     Defendant Has Failed to Show that Plaintiff Consented to the Disclosure of Her Video Watching Behavior on Defendant's Website.

Defendant's consent-related argument based upon the Cookies Policy, (Def.'s Mem. at 13:21-14:8), is without merit. First, the banner for the Cookies Settings states:

> "We use cookies to make our website work, tailor advertising, provide social media features and analyze site usage. You can manage cookies by clicking "Cookie Settings." For more information, visit our **Cookie Policy**[.]"

(Ferrell Decl. Ex. 1) (emphasis in original). Defendant has made no argument at all that reasonable consumers would know from such banner that Defendant discloses an individual's video watching behavior while watching a video on Defendant's Website.

In addition, the foregoing banner is insufficient to prove as a matter of law that Plaintiff impliedly consented to any VPPA violation while using Defendant's Website. After all, it is black letter law that electronic contracts of adhesion must be evaluated for their conspicuousness to determine whether a consumer has assented to it. *Sellers v. Just Answer LLC*, 73 Cal. App. 5th 444, 469 (2021); *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 865 (2016); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1176 (9th Cir. 2014). "California law is clear-'an offeree, regardless of apparent manifestation of his consent, is not bound by ***inconspicuous*** contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Sellers*, 73 Cal. App. 5th at 461 (quoting *Long*, 245 Cal. App. 4th at 862) (emphasis added). "In the absence of actual knowledge, a reasonably prudent user must be on constructive notice of the terms of the contract for a browsewrap agreement to be valid." *Wilson v. Huuuge, Inc.*, 944 F.3d 1212, 1220 (9th Cir. 2019). "Users are put on constructive notice based on the conspicuousness and placement of the terms and conditions, as well as the content and overall design of the app." *Id.* "The Ninth Circuit has held … that such privacy policies do not bind users[.]" *Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1081 (C.D. Cal. 2021) (Holcomb, J.) (citing *Nguyen*). Defendant's Memorandum is bereft of any cogent analysis as to the conspicuousness of Defendant's banner.

Furthermore, although Defendant relies upon its disclosure regarding "Targeting Cookies," (RJN Ex. A; PageID.70), such disclosure merely states, "These cookies uniquely identify your browser and internet device and observe your behaviors and

browsing activities over time across multiple websites or other platforms." The phrase, "observe your behaviors and browsing activities over time," is vague. Defendant offers nothing to show that the Court should hold as a matter of law that reasonable consumers know that such phrase is meant to include an individual's video watching behavior.

**B.    The Court Should Not Dismiss for Lack of Personal Jurisdiction.**

**1.    California Follows the Sliding Scale Approach Described in *Zippo Mfg. Co. v. Zippo Dot Com, Inc*.**

In *Zippo Mfg. Co. v. Zippo Dot Com, Inc.* 952 F. Supp. 1119 (W.D. Pa. 1997), the federal district court issued a seminal decision analyzing the permissible scope of personal jurisdiction based on a nonresident defendant's Internet use of its website. The *Zippo* court held that:

> "[T]he likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet. This sliding scale is consistent with well developed personal jurisdiction principles. ***At one end of the spectrum are situations where a defendant clearly does business over the Internet. If the defendant enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files over the Internet, personal jurisdiction is proper.*** At the opposite end are situations where a defendant has simply posted information on an Internet Web site which is accessible to users in foreign jurisdictions. A passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise personal jurisdiction. ***The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.***"

*Zippo*, 952 F. Supp. at 1124 (internal citations omitted and emphasis added). The *Zippo* court explained, "Traditionally, when an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction is proper. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). Different results should not be reached simply because business is conducted over the Internet." *Zippo*, 952 F. Supp. at 1124. "When a defendant makes a conscious choice to conduct business with the residents of a forum state, 'it has clear notice that it is subject to suit there.'" *Zippo*, 952 F. Supp. at 1126 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). "If a corporation determines that the risk of being subject to personal

1  jurisdiction in a particular forum is too great, it can choose to sever its connection to the

2  state." *Zippo*, 952 F. Supp. at 1126 (*World–Wide Volkswagen*, 444 U.S. at 297).

3      California follows the *Zippo* sliding-scale test of website interactivity.  *Thurston v.*

4  *Fairfield Collectibles of Georgia, LLC*, 53 Cal. App. 5th 1231, 1237-38 (2020), *review*

5  *denied*, No. S264780 (Dec. 9, 2020).   Indeed, the Court of Appeal cited the *Zippo*

6  decision.  *Id.* at 1240.

7      **2.      The Court Can and Should Infer that Defendant's Website Is**

8              **Interactive.**

9          **a.      Defendant's Website Has Numerous Interactive Features.**

10      Although Defendant's Motion implies that Defendant's Website is passive,

11  Defendant's analysis ignores the numerous interactive features of its Website.   For

12  example, the Website is interactive because it has a "Contact Us" hyperlink that, if

13  clicked, takes the user to a webpage that allows users to send an email to Defendant

14  regarding a variety of topics including, but not limited to, where to buy Defendant's

15  products.  (Ferrell Decl. ¶ 3 & Ex. 2.)  In order to send such email to Defendant, the user

16  must input the user's first name, last name, email address, and zip code.  *Id.*

17      In addition, the Website also has a "Product Locator" hyperlink that, if clicked,

18  takes the user to a webpage that invites users to "SIGN UP FOR THE NEWSLETTER"

19  by typing the user's email address.  (Ferrell Decl. ¶ 4 & Ex. 3.)

20      Furthermore, the Website contains a hyperlink to a webpage named "Product

21  Locator" at which the user can search for nearby brick-and-mortar retail stores based

22  upon the input of the user's city, state, or zip code.  (Ferrell Decl. ¶ 5 & Ex. 3.)  Such

23  webpage also identifies online stores that sell Defendant's products.  *Id.*

24          **b.      Defendant's Website Is Both Highly Interactive and Commercial**

25                  **Especially Because It Functions as a Gateway that Funnels**

26                  **Customers to Defendant's Online Store.**

27      Besides  the  foregoing  examples  of  the  Website's  interactivity  with  users,

28  Defendant's Website has a hyperlink named "Hershey Store" at the bottom of each

webpage that connects the user to Defendant's online store at which it is possible to purchase Defendant's products online directly from Defendant. (Ferrell Decl. ¶ 6 & Ex. 4.) In addition, as mentioned above, the Website has a hyperlink to a webpage named "Product Locator," which identifies online stores that sell Defendant's products. (Ferrell Decl. ¶ 5 & Ex. 3.) Thus, the Website has numerous features that can and should be considered to be highly interactive for purposes of the sliding-scale test.

In addition, it is beyond dispute that the exchange of information that occurs on the Website is highly commercial in nature as bolstered by the fact that such Website functions operationally as the gateway to Defendant's online store and the online stores of other retailers. The Website is a marketing platform that targets potential customers of Defendant's products.

Given that the Website is highly interactive as the gateway to Defendant's online store, and such interactivity is commercial in nature, the Court should determine that Plaintiff has met the sliding-scale test and demonstrated that Defendant has engaged in purposeful availment here in California.

### c. The Court Should Defer Ruling on Personal Jurisdiction Grounds Until After Plaintiff Has Had an Opportunity to Conduct Limited Jurisdictional Discovery.

If the Court is inclined to grant Defendant's Motion for lack of specific jurisdiction, Plaintiff should first be afforded an opportunity to conduct limited jurisdictional discovery regarding Defendant's online sales figures for California versus nationwide sales figures. *Huffaker v. Eagle Fuel Cells, Inc.*, 2020 WL 515977, at *6 (S.D. Cal. Jan. 31, 2020) (Curiel, J.) (granting the plaintiff's request for jurisdictional discovery to establish personal jurisdiction). "To warrant jurisdictional discovery, the moving party must present a 'colorable basis' for its request." *Symettrica Enter., Ltd. v. UMG Recordings, Inc.*, 2019 WL 8806093, at *5 (C.D. Cal. Sept. 20, 2019) (Carney, J.) (citing *Lang v. Morris*, 823 F. Supp. 2d 966, 979 (N.D. Cal. 2011)).

1    Here, Plaintiff has presented at least a "colorable basis" that specific personal
2    jurisdiction exists.  Defendant has not disclosed any of its online sales of its products
3    derived from consumers with a California address for any period of time.  Given the
4    important role played by the Website in serving as a gateway to Defendant's online store,
5    which funnels online sales of Defendant's products, such sales are relevant to applying
6    the *Zippo* sliding scale test of website interactivity.  In *Thurston v. Fairfield Collectibles*
7    *of Georgia, LLC*, 53 Cal. App. 5th 1231 (2020), *review denied*, No. S264780 (Dec. 9,
8    2020), the Fourth District Court of Appeal issued a published decision reversing a trial
9    court granting of a motion to quash service of summons.  *Id.* at 1234.  In so doing, the
10   Court of Appeal held that the out-of-state defendant's sales totaled some "$320,000 to
11   $375,00 a year," which "is the equivalent of having a brick-and-mortar store in
12   California—a 'virtual store.'"  *Id.* at 1240.  And, *Thurston* relied upon evidence that
13   showed that the out of state defendant website operator "makes some eight to ten percent
14   of its sales to Californians."  *Id.* at 1234.  "Hence, its website is the equivalent of a
15   physical store in California."  *Id.*

16   To date, the parties have not conducted a Rule 26(f) conference, which is necessary
17   to commence such discovery.  Thus, this Court can and should defer ruling on the
18   question of specific personal jurisdiction until after Plaintiff has had a reasonable
19   opportunity to conduct limited jurisdictional discovery on the issue of specific personal
20   jurisdiction and to address it to the Court via supplemental briefing.

21   **C.    The Complaint Sufficiently Pleads a VPPA Claim.**

22       **1.    Defendant Is a "Video Tape Service Provider" Under the VPPA.**

23   The Complaint plausibly alleges that Defendant is a "video tape service provider"
24   under the VPPA.  First, the VPPA defines "video tape service provider" to mean "any
25   person, engaged in the business, in or affecting interstate or foreign commerce, of rental,
26   sale, ***or delivery of*** prerecorded video cassette tapes ***or similar audio visual materials***
27   …."  18 U.S.C. § 2710(a)(4) (emphasis added).  Thus, the plain language of the VPPA is
28   not limited to the sale or rental of "prerecorded video cassette tapes."  Indeed, multiple

- 11 -

federal courts have recognized that the VPPA's legislative history recognized "'Congress' intent to cover new technologies for pre-recorded video content.'" *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (quoting *In re Hulu Privacy Litig.*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) (Beeler, Mag. J.) ("The court concludes that Congress used 'similar audio visual materials' to ensure that VP[P]A's protections would retain their force even as technologies evolve.") (quoting S. Rep. 100–599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1; 1988 WL 243503, at *12) (discussing "similar audio visual materials, such as laser discs, open-reel movies, or CDI technology")).  Indeed, Defendant acknowledges that the VPPA covers ***new technologies*** including video streaming technology for the delivery of pre-recorded video content.  (Def.'s Mem. at 20:13-17.)  Although Defendant implies that the VPPA should be interpreted as limited to online providers of streaming videos, (Def.'s Mem. at 20:13-17), Defendant ignores that courts have recognized that "Congress's use of the phrase 'similar audiovisual materials' indicates that ***the definition is medium-neutral***; the defendant must be in the business of delivering video content, ***but that content need not be in a particular format***."  *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (emphasis added).  Notably, Defendant has cited *In re Vizio* for other reasons.  (Def.'s Mem. at 19:18-20:3.)  Thus, Defendant is surely well aware of its holding in this regard.

Second, numerous federal courts have interpreted the term, "video tape service provider," as including commercial website owners/operators.  *See, e.g.*, *Belozerov v. Gannett Co., Inc.*, - F. Supp. 3d -, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022); *Czarnionka v. The Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) (noting complaint's allegation that owner/operator of theepochtimes.com delivers audiovisual materials including "news programs, television shows, documentaries, movies, and other audiovisual content"); *Lebakken v. WebMD, LLC*, 2022 WL 16716151, at *1, *3 & n.2 (N.D. Ga. Nov. 4, 2022) (noting allegation that owner/operator of WebMD.com provides "online health information and medical news");

*Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (noting allegation that bostonglobe.com "is engaged in the business of delivering various types of video content"); *Louth*, 2022 WL 4130866, at *4 (denying motion to dismiss as to pre-recorded content on NFL mobile application); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 798-99 (N.D. Cal. 2019) (Chhabria, J.) (denying motion to dismiss regarding Facebook's website); *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) (Seeborg, J.) (denying motion to dismiss regarding walmart.com); *Yershov v. Gannett Satellite Info Network, Inc.*, 820 F.2d 482, 485 n.2 (1st Cir. 2016) (noting that defendant operator of USA Today Mobile App failed to challenge sufficiency of complaint alleging it to be a "video tape service provider"); *In re Hulu Privacy Litig.*, 2012 WL 3282960 at *6 (rejecting argument that VPPA does not cover streaming service purportedly because VPPA does not expressly cover digital distribution).

Such decisions should be treated as persuasive based on their reasoning. Defendant is "engaged in the business of delivering computer files containing video content, which are 'similar audio visual materials' to prerecorded cassette tapes." *Belozerov*, 2022 WL 17832185, at *3; (*see* Compl. ¶ 52). That suffices. Notably, Defendant's Memorandum omits addressing *Belozerov*, which speaks volumes.

Although Defendant contends that a company like itself, which is a candy manufacturer, (Def.'s Mem. at 3:1; Compl. ¶ 7), should not be viewed as a "video tape service provider" because its primary function is not to sell, rent, or deliver audio visual materials, *id.* at 20:4-12, the VPPA's language does not exclude such provider. There is nothing in the plain language of the VPPA statute imposing a "primary function" limitation or limiting the definition to a business engaged in a media business or actually selling or renting video media.

Furthermore, Defendant's reliance upon *In re Vizio, Inc. Consumer Privacy Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017), is misplaced. Although the court therein stated that "'business' connotes 'a particular field of endeavor,' *i.e.*, a focus of the

defendant's work," *id.* at 1221, as used in 18 U.S.C. § 2710(a)(4), the court also stated that "the defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *Id.* at 1221. Notably, the court then cited an example of "a letter carrier who physically places a package that happens to contain a videotape into a consumer's mailbox," as not engaged in the "business" of delivering video content because "her job responsibilities are in no way tailored to delivering packages that contain videotapes as opposed to any other package." *Id.* The court then held that "Plaintiffs plausibly allege that Vizio's Internet Apps and Internet Apps Plus are designed to enable consumers to seamlessly access Netflix, Hulu, YouTube, and Amazon Instant Video content in their homes." *Id.* at 1222. In support, the court noted in relevant part that "these Smart TVs are designed to stream video content through Vizio's Internet Apps and Internet Apps Plus software." *Id.* Much like the Smart TVs at issue in *In re Vizio* were designed to stream video content via Internet-connected software, Defendant's website at https://www.thehersheycompany.com (the "Website"), which is owned, operated, and controlled by Defendant, (Compl. ¶¶ 16-17), is designed to display audio visual materials constituting videos on its Website to visitors of such Website. *Id.* Indeed, the Complaint alleges that Defendant's business model involves using pre-recorded videos to promote and monetize its products. *Id.* ¶ 12. Thus, Defendant's design and operation of its Website is much closer to the Smart TV manufacturer in *In re Vizio* than the letter carrier hypothetical cited therein. That is, Defendant is "substantially involved in the conveyance of video content to consumers [and its Website is] significantly tailored to serve that purpose." *In re Vizio*, 238 F. Supp. 3d at 1221.

Additionally, *Stark v. Patreon, Inc.*, - F. Supp. 3d -, 2022 WL 7652166, at *7 (N.D. Cal. Oct. 13, 2022), supports Plaintiff's position because the court noted:

> "*[I]t is reasonable to think that developing a website to deliver video content requires more significant 'tailor[ing] to serve that purpose' than a package delivery service shipping videocassettes along with other physical goods*. *See id.* at 1221. That third-party 'creators' may also be involved in developing and delivering the videos at issue does not absolve Patreon of liability—'a defendant

can be 'engaged in the business' of delivering video content even if other actors also take part in the delivery of the same video content.' *Id.* Nothing in Patreon's terms of use or other policies offered for judicial notice dispels the inference that Patreon 'delivers' videos through its platform, even if those videos are created by third parties."

*Stark*, 2022 WL 7652166, at *7 (emphasis added).  Thus, *Stark* supports Plaintiff's position that developing a website to deliver video content requires far more "tailoring" to serve that purpose than a letter carrier shipping video cassettes or DVDs and other physical goods to consumers.

Finally, Defendant's dire prediction that Plaintiff's interpretation of a "video tape service provider" defines such term too broadly such that it would "apply the VPPA to any website where a consumer can watch an embedded video clip," (Def.'s Mem. at 1:10-11), is wrong.  For example, website owners/operators with no commercial interest (such as a non-profit entity) are clearly beyond the scope of the VPPA.  That is why the VPPA has defined the "video tape service provider" to "any person, engaged in the business, in or affecting *interstate or foreign commerce*," as part of its definition.  18 U.S.C. § 2710(a)(4) (emphasis added).

### 2.    Plaintiff Is a "Consumer" as Defined by the VPPA.

The VPPA defines the term "consumer" to mean "any renter, *purchaser*, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1) (emphasis added).  Notably, the VPPA does not define the meaning of the term, "purchaser."  Plaintiff is a "purchaser" of goods from a "video tape service provider".  (Compl. ¶ 38.)  The Complaint alleges that "Plaintiff, like most Americans, has eaten and enjoyed Hershey's products." (Compl. ¶ 38.)  These allegations suffice to make Plaintiff a "purchaser" of "goods" or "services" from a "video tape service provider." 18 U.S.C. § 2710(a)(1).

By arguing that the Complaint's allegations are inadequate because they do not expressly allege that Plaintiff purchased Defendant's products in the past, (Def.'s Mem. at 20:27-21:5), Defendant misconstrues the applicable legal standard under Rule 8(a) of the Federal Rules of Civil Procedure.  Defendant ignores that the Complaint's allegations

must be construed to draw all reasonable inferences in Plaintiff's favor.  *Barker v. Riverside County Office of Education*, 584 F.3d 821, 824 (9th Cir. 2009) ("we must draw inferences in the light most favorable to the plaintiff").  "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im* plausible."  *Id.*  "The standard at th[e] [motion to dismiss] stage of the litigation is not that plaintiff's explanation must be true or even probable.  The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Defendant's contention that Plaintiff is not a "consumer" within the meaning of the VPPA is without merit.  The VPPA does not define or restrict the meaning of the term, "purchaser," to a person who buys any goods or services by a particular method or location.  Nor does the VPPA define or limit such term to a person why buys any goods or services ***constituting audio visual materials***.  Instead, such term is undefined and unlimited.  "As a 'broad remedial statute,' the [VPPA] must be liberally construed in favor of the consumer in order to effectuate this goal of eliminating abuse."  *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1078-79 (9th Cir. 2016) (internal citation omitted).[5]  "[T]he phrase 'goods or services' is generally construed broadly to encompass 'all parts of the economic output of society.'"  *Lebakken*, 2022 WL 16716151, at *3.  The Court should reject Defendant's attempt to read into the VPPA's plain language an interpretation that is unsupported.

Defendant's reliance upon *Carter v. Scripps Networks, LLC*, 2023 WL 3061858 (S.D.N.Y. Apr. 24, 2023), is misplaced because it is unpersuasive for several reasons.

---

[5] *See also Leader v. Cords*, 182 Cal. App. 4th 1588, 1598 (2010) ("A remedial statute ' 'must be liberally construed 'to effectuate its object and purpose, and to suppress the mischief at which it is directed.' [Citations.]' '") (citations omitted); *cf. Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016)(quoting *Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002) and citing *Ribas v. Clark*, 38 Cal. 3d 360-61 (1985)).

First, *Carter* ignores the well-established rule that a plain meaning analysis applies to statutory interpretation if there is no ambiguity in the statutory language.  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992) ("When the words of a statute are unambiguous, then, this first canon is also the last:  'judicial inquiry is complete.'") (citation omitted).  Simply put, the statutory text is clear that the VPPA defines the term "consumer" to mean "any renter, ***purchaser***, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added).  The VPPA does not define or restrict the meaning of the term, "purchaser," to a person who buys any goods or services ***constituting audio visual materials***.  Nor does the VPPA define or restrict the term "subscriber" to mean "subscribers to audio visual materials," as held in *Carter*.  2023 WL 3061858, at *6.

As mentioned above, "[T]he phrase 'goods or services' is generally construed broadly to encompass 'all parts of the economic output of society.'" *Lebakken*, 2022 WL 16716151, at *3.  Indeed, *Carter* itself acknowledges, "The statute does not limit or qualify 'goods or services' to video materials." *Carter*, 2023 WL 3061858, at *5.  Given the foregoing acknowledgment in *Carter*, its resort to a statutory interpretation going beyond the plain meaning of the statutory language was improper.

Second, *Carter* erred by failing to liberally construe the VPPA, whose purpose is to protect the privacy rights of individuals.  *Hernandez*, 829 F.3d at 1078-79.

Third, *Carter* is distinguishable because the plaintiffs therein did not allege that they were a "purchaser" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1).  The complaint in *Carter* merely alleged that the plaintiffs were "consumers" "because they subscribed to HGTV's newsletter." *Id.* at *2.  *Carter* noted, "There is no suggestion that plaintiffs purchased or rented a covered good or service from HGTV." *Id.* at *4.  Thus, *Carter*'s analysis is limited to interpreting the term, "subscriber," in the VPPA statute, 18 U.S.C. § 2710(a)(1), which is completely irrelevant to the instant action because Plaintiff has not alleged that she is a "subscriber" within the

meaning of section 2710(a)(1).  This is also why *Austin-Spearman v. AMC Network Enter. LLC*, 98 F. Supp. 3d 662, 668 (S.D.N.Y. 2015), is irrelevant.

> **3.    The Complaint Sufficiently Alleges Defendant's Disclosure of Plaintiff's Personally Identifiable Information to Facebook and Defendant's Knowledge of Such Disclosure.**

The VPPA "broadly" defines the term "personally identifiable information" as including "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d at 798 (citing 18 U.S.C. § 2710(a)(3)).  "The statute does not require an actual name and requires only something akin to it." *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014). As the Ninth Circuit has put it, personal identifiable information ("PII") is "information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."  *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).

> **a.    The VPPA Defines PII to Include the Title, Description, and Subject Matter of Videos.**

Notably, the VPPA is not limited to the titles of videos within the definition of PII. First, the VPPA defines the PII term as "***includes*** information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3) (emphasis added).  Notably, the statutory definition of PII does not include any reference to the "title" of "specific video materials or services."  The reasonable inference to be drawn from such omission is that Congress intended for "specific video materials or services" to be interpreted to mean items beyond the mere "title" of "specific video materials or services".  Otherwise, surely Congress would have defined PII to expressly refer to the "title" of "specific video materials or services" as the sole method of "information which identifies a person as having requested or obtained "specific video materials or services from a video tape service provider".

Second, the PII term uses the word "includes," which is broadly construed, as

- 18 -

opposed to the restrictive term, "means." Notably, the Ninth Circuit has characterized the word "includes" as "open-ended". *Eichenberger*, 876 F.3d at 984. Similarly, a federal court has noted, "This word [includes] 'normally implies that the proffered definition falls short of capturing the whole meaning.'" *In re Vizio, Inc*, 238 F. Supp. 3d at 1224 (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) and *United States v. Angelilli*, 660 F.2d 23, 31 (2d Cir. 1981) ("The use of the word 'includes,' rather than a more restrictive term such as 'means,' 'indicates that the list is not exhaustive but merely illustrative.'") (citation omitted)).

Indeed, in *Yershov*, the First Circuit expressly cited and agreed with the VPPA's legislative history, which stated that "paragraph (a)(3) uses the word 'includes' to establish a minimum, but not exclusive, definition of personally identifiable information." S. Rep. 100–599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1; 1988 WL 243503; *see Yershov*, 820 F.3d at 486. If Congress intended to limit the PII term to the title of videos only, then surely Congress would have used the term "means" instead. "'As a rule, [a] definition which declares what a term 'means' ... excludes any meaning that is not stated.'" *In re Vizio, Inc.*, 238 F. Supp. 3d at 1224 (quoting *Burgess v. United States*, 553 U.S. 124, 130 (2008) (citation omitted)).

Third, the VPPA provides that:

> "A video tape service provider may disclose personally identifiable information concerning any consumer—
> …
> (D) to any person if the disclosure is solely of the names and addresses of consumers and if—
> > (i) the video tape service provider has provided the consumer with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure; and
> > (ii) the disclosure does not identify the ***title***, ***description***, or ***subject matter*** of any video tapes or other audio visual material; however, the ***subject matter*** of such materials may be disclosed if the disclosure is for the exclusive use of marketing goods and services directly to the consumer…."

18 U.S.C. § 2710(b)(2)(D) (emphasis added). The fact that Congress grouped together "the title, description, or subject matter of any video tapes or other audio visual material"

within a specific exception to the nondisclosure mandate of the VPPA is highly significant because it strongly indicates that Congress intended for the definition of PII to include the identity of "the title, description, or subject matter" of visual materials or services.  "Under the principle of *noscitur a sociis*, 'a word is known by the company it keeps.'"  *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534 (5th Cir. 2016), *cert. denied*, 138 S. Ct. 55 (2017); *Karczewski v. DCH Mission Valley LLC*, 862 F.3d 1006, 1016 (9th Cir. 2017) (citing *Yates v. United States*, 574 U.S. 528, 543 (2015) ("a word is known by the company it keeps")).  Thus, a well-known canon of statutory construction supports Plaintiff's interpretation.

Fourth, at least one federal court has recognized that PII under the VPPA is defined to include the subject matter of videos.  *See In re Borders Group, Inc.*, 2011 WL 5520261, at *49 (Bankr. S.D.N.Y. Sept. 27, 2011).

Finally, a hypothetical illustrates the frailty of a narrow interpretation of the PII term.  Hypothetically, what difference would it make if the specific title of a pornographic video obtained or watched by a consumer is not disclosed to a third party by a video store retailer or a commercial website operator, but the "description" of such video as pornography or even more specific information about such video or the "subject matter" of such video as pornography or sexual intercourse is disclosed about the video watching habits of consumers?  It stands to reason that the vast majority of consumers would surely be mortified to learn that their video watching habits about such highly confidential, sensitive, and private matters were disclosed to a third party regardless of whether the precise title of the video was redacted from the disclosure.

This hypothetical illustrates precisely why the only reasonable interpretation of the definition of PII is that it is not limited to the precise "title" of a video.  It also includes the "description" and the "subject matter" of the video.

### b.   The Complaint's Allegations that Defendant Knowingly Disclosed Plaintiff's PII to Facebook Is Plausible.

The Complaint sufficiently alleges Defendant's disclosure of Plaintiff's PII to

Facebook and Defendant's knowledge of such disclosures. (Compl. ¶¶ 10-44.) The Complaint sufficiently alleges that Defendant has disclosed Plaintiff obtaining specific video materials from the Website via the Facebook Tracking Pixel. (Compl. ¶¶ 10-44, 54.) The Court is required to take as true the foregoing allegations for purposes of the instant Motion. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations") (citation omitted).

The Complaint alleges that by embedding the Facebook Tracking Pixel's code onto its Website, Defendant compels a user's browser to send numerous cookies to Facebook, (Compl. ¶¶ 25-34), which includes the "c_user cookie," which "contains that visitor's unencrypted Facebook ID." *Id.* ¶ 25. This is how Facebook is able to identify a website visitor's video watching behavior.

Indeed, multiple federal courts have recognized as plausible the allegation that the Facebook ID itself constitutes PII. *Feldman v. Star Tribune Media Company LLC*, 2023 WL 2388381, at *8-*10 (D. Minn. Mar. 7, 2023); *Belozerov*, 2022 WL 17832185, at *3 ("A Facebook ID meets the broad definition of PII in this circuit") ("A Facebook ID is a unique identifier that allows anyone to discover the user's identity."); *Czarnionka*, 2022 WL 17069810, at *4; *Lebakken*, 2022 WL 16716151, at *4; *Stark v. Patreon, Inc.*, - F. Supp. 3d -, 2022 WL 7652166, at *7-*8 (N.D. Cal. Oct. 13, 2022); *Ambrose*, 2022 WL 4329373, at *2; *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *14 ("The Facebook User ID is more than a unique, anonymous identifier. ***It personally identifies a Facebook user***. That it is a string of numbers and letters does not alter the conclusion. Code is a language, and languages contain names, and the string is the Facebook user name.") (emphasis added) (finding a material issue of fact that the information transmitted to Facebook was sufficient to identify individual consumers). The Court should follow such decisions.

Indeed, although the Ninth Circuit applies the ordinary person test, *Eichenberger*, 876 F.3d at 985, the Ninth Circuit noted that a "Facebook link … may very well readily enable an 'ordinary person' to identify an individual." 876 F.3d at 986, *quoted in Stark*,

2022 WL 7652166, at *7. Notably, Defendant has conveniently omitted this portion of *Eichenberger* from its Memorandum despite citing *Eichenberger* for other propositions. (Def.'s Mem. at 23:18-23; 24:10-13.)

Furthermore, the above-mentioned decisions that recognize that a Facebook ID constitutes PII similarly recognize as plausible the allegation that a defendant website operator programmed the Facebook Pixel into its website code satisfies the "knowingly discloses" element of VPPA in 18 U.S.C. § 2710(b). *Feldman*, 2023 WL 2388381, at *10; *Belozerov*, 2022 WL 17832185, at *4; *Czarnionka*, 2022 WL 17069810, at *4; *Lebakken*, 2022 WL 16716151, at *4-*5; *Stark*, 2022 WL 7652166, at *7-*8; *Ambrose*, 2022 WL 4329373, at *2. "By installing the Pixel, Defendant opened a digital door and invited Facebook to enter that door and extract information from within." *Czarnionka*, 2022 WL 17069810, at *3. "[A]rguing that transmitting cookies is just the normal way that webpages … load is not enough to negate knowledge or show the absence of evidence about knowledge." *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *16.

Defendant deliberately integrated the Facebook Tracking Pixel's software code into its Website. (Compl. ¶¶ 13, 19.) Defendant's analysis ignores the foregoing case authority and the Complaint's factual allegations showing that Defendant intentionally allowed its Website to host the Facebook Tracking Pixel for advertising purposes. (Comp. ¶¶ 1, 56.)

### c.      The Facebook ID Depicted in Various Figures Belongs to Plaintiff's Expert.

Although Defendant contends that the Facebook ID, 100087271304389, depicted in Figure 6 of the Complaint (for illustrative purposes), does not belong to Plaintiff and is identical to other complaints filed by other litigants, (Def.'s Mem. at 8:8-17; 24:5-7; Def.'s RJN Ex. S at pg. 248 of 257; PageID.306; Doc. 5-2), Defendant does not realize that it is the Facebook ID account that belongs to ***Plaintiff's expert***. As such, there is nothing nefarious about the Facebook ID depicted in the Complaint.

### d.      ***Martin v. Meredith Corp.*** **Is Distinguishable.**

Defendant's reliance upon *Martin v. Meredith Corp.*, - F. Supp. 3d -, 2023 WL 2118074, at *4 (S.D.N.Y. Feb. 17, 2023), *appeal docketed*, No. 23-412 (2d Cir. Mar. 17, 2023), is misplaced because it is distinguishable.   In *Martin*, an individual filed suit against Dotdash Meredith, "one of the world's largest online media companies," which operates www.people.com, and related entities for violation of the VPPA alleging that the defendants unlawfully disclosed information about the plaintiff's video viewing history to Facebook.  *Id.* at *1.  According to *Martin*, the complaint therein alleged as follows:

> "Dotdash Meredith shares information with Facebook using software called the 'Facebook Pixel.' The Facebook Pixel allows Facebook to match a website visitor to a particular Facebook account.
>     To install the Facebook Pixel on a website, the website operator starts by adding a publicly available base code created by Facebook (the 'Base Pixel') to their website.  ***The Base Pixel, as a default, sends Facebook the name of the webpage viewed by a website visitor, along with the visitor's 'Facebook ID.'  The website operator can also customize the Base Pixel to track specific events***, such as a visitor clicking an 'add to cart' button, ***which enables the Facebook Pixel to send additional data to Facebook related to the customized events***. ***Dotdash Meredith has installed the Facebook Pixel on People.com but 'has not created any specific events***, such as 'add to cart' or 'checkout' ***for additional tracking***.' "

*Martin*, 2023 WL 2118074, at *1 (emphasis added).  Thus, the clear import from the allegations of the complaint in *Martin* is that only the default Facebook Base Pixel was added to the defendants' website, which ***only*** sends Facebook "the name of the webpage viewed by a website visitor, along with the visitor's 'Facebook ID.'"  *Id.*  In other words, the complaint therein admitted that the defendants did not customize the Base Pixel for any additional tracking of website users.

The defendants moved to dismiss the VPPA claim, which the district court granted because "the complaint itself shows that the defendants do not disclose information showing that a person has 'requested or obtained specific video materials or services.'" *Id.* at *3.  The court noted that, "As the complaint alleges, … the version of the Facebook Pixel used on People.com sends only the Facebook ID and the name of the webpage that a user accessed." *Id.*

Notably, *Martin* analyzed two specific examples alleged in the complaint of two different videos in which discrepancies existed in the titles of the videos on certain

webpages used to illustrate the alleged violations and the names of the webpages in which such videos were on. *Id.* That is, the videos used as illustrations had titles that were not verbatim identical to the names of the webpages on which the videos were viewable. *Martin* concluded that "as the examples show, disclosing to a third party the title of the webpage does not reveal the ***title*** of a video on the page, let alone whether the website visitor requested or obtained the video instead of merely reviewing an article on the page." *Id.* (emphasis added). That is, *Martin* focused exclusively on the "title of a video" on a webpage in determining whether PII had been improperly disclosed to "any person" without informed, written consent.

In *Martin*, the court rejected the plaintiff's argument that "providing a URL associated with a video is sufficient to state a VPPA claim," *id.* at *4, as follows:

> "Plaintiff also argues that providing a URL associated with a video is sufficient to state a VPPA claim. This argument fails. A claim under the VPPA requires that the information disclosed identify a person "as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). Simply sending a URL of a People.com webpage which may or may not include a video does not show that a person requested or obtained specific video materials or services. And even for webpages including a video, sending the URL does not identify a person as having requested or obtained the video on that page since the person may instead have merely reviewed an article on the page or opened the page and done nothing more."

*Martin*, 2023 WL 2118074, at *4.

*Martin* is distinguishable for several reasons. First, *Martin* did ***not*** purport to hold as a matter of law that any and all use of the Facebook Pixel would invariably result in the mere tracking of "the Facebook ID and the name of the webpage that a user accessed." *Martin*, 2023 WL 2118074, at *3. As *Martin* repeatedly stated, the complaint therein merely alleged that the defendant had retained the "default settings" for the Facebook Pixel, *i.e.*, the base code, and had not created any customized settings to track any specific events. *Id.* at *1, *4. In stark contrast, no such judicial admission exists in either the original Complaint or the FAC *sub judice* in the instant action. Indeed, if anything, the Court can and should draw the inference that Defendant has, in fact, customized the Facebook Pixel settings applicable here because the Complaint expressly alleges that

Defendant has knowingly disclosed Plaintiff's PII to Facebook. (Compl. ¶ 56.) As mentioned above, the Court is required to draw inferences in the light most favorable to Plaintiff. *Barker*, 584 F.3d at 824 ("we must draw inferences in the light most favorable to the plaintiff") (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). Notably, Defendant has made no attempt to argue that it has not customized any settings of the Facebook Pixel embedded into its Website, presumably to obfuscate this precise issue.

Second, *Martin* assumed without engaging in any analysis that PII only includes the "title" of a video and nothing else. *Martin*, 2023 WL 2118074, at *3 ("disclosing to a third party the title of the webpage does not reveal the ***title*** of a video on the page") (emphasis added). That is, *Martin* ignored analyzing whether PII includes other types of information including a "description" or the "subject matter" of any "audio visual material". 18 U.S.C. § 2710(b)(2)(D)(ii). Such omission is significant because, as mentioned above, it is clear from the statutory language that PII is not limited to merely the "title" of "specific video material or services from a video tape service provider". 18 U.S.C. § 2710(a)(3). Thus, *Martin* is not persuasive because it failed to address the question whether PII under the VPPA is limited to only the "title" of videos or also includes the "description" or "subject matter" of videos as well.

**D.    If a Curable Defect Remains, Leave to Amend Should Be Granted.**

If the Court is inclined to grant the instant Motion due to a curable pleading deficiency, this Court can and should grant Plaintiff leave to amend. *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); Fed. R. Civ. P. Rule 15(a)(2).


Dated:  June 5, 2023                         PACIFIC TRIAL ATTORNEYS, P.C.

                                             By: */s/ Scott J. Ferrell*
                                             Scott. J. Ferrell
                                             Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2023, I electronically filed the foregoing **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS CLASS ACTION COMPLAINT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

Dated:  June 5, 2023

*/s/ Scott J. Ferrell*
Scott J. Ferrell